UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JESSE LEPRE,                        :
        Plaintiff,                  :
                                    :
    v.                              :        CA 10-274 S
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER,                       :
SOCIAL SECURITY ADMINISTRATION,     :
        Defendant.                  :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

        This matter is before the Court on the request of Plaintiff
Jesse Lepre ("Plaintiff") for judicial review of the decision of
the Commissioner of Social Security ("the Commissioner"), denying
Disability Insurance Benefits ("DIB"), and Supplemental Security
Income ("SSI"), under §§ 205(g) and 1631(c)(3) of the Social
Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the
Act").  Plaintiff has filed a motion for an order reversing the
decision of the Commissioner.  Defendant Michael J. Astrue
("Defendant") has filed a motion for an order affirming the
Commissioner's decision.

        This matter has been referred to me for preliminary review,
findings, and recommended disposition pursuant to 28 U.S.C. §
636(b)(1)(B).  I find that the Commissioner's determination that
Plaintiff is not disabled is supported by substantial evidence in
the record and is legally correct.  Accordingly, for the reasons

set forth herein, I recommend that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket ("Dkt.") #10) ("Motion to Affirm") be granted and that Plaintiff's Motion for an Order Reversing the Decision of the Commissioner (Dkt. #9) ("Motion to Reverse") be denied.

## Facts and Travel

Plaintiff was born in 1977 and was twenty-nine years old as of his alleged onset date. (Record ("R.") at 23, 122) He completed four years of college, (R. at 164), attended graduate school, (R. at 32), and has past relevant work as a personal trainer, loan officer, auto sales administrative accountant, recruiter, tennis instructor, and front desk clerk, (R. at 23, 160).

On October 31, 2007, Plaintiff filed applications for DIB and SSI, alleging disability since April 21, 2007, because of a brain tumor with resulting balance problems, headaches, neurological problems, and concentration problems. (R. at 13, 77, 87, 159) His applications were denied initially, (R. at 73-74), and upon reconsideration, (R. at 75-76). Plaintiff requested an administrative hearing. (R. at 90) On May 4, 2009, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did an impartial vocational expert, Michael LaRaia ("VE"), and an impartial medical expert, Gerald F. Winkler, M.D. ("ME"). (R.

at 25-66)  The ALJ issued a decision on May 19, 2009, finding that Plaintiff had requested a closed period of disability from April 21, 2007, through April 26, 2009, (R. at 13), and that Plaintiff was not disabled during this time, (R. at 13-24).  The Decision Review Board selected Plaintiff's case for review, (R. at 10), but did not complete its review of the claim during the ninety day period, (R. at 7-9), thereby rendering the ALJ's decision the final decision of the Commissioner, (R. at 7).  Plaintiff thereafter filed this action for judicial review.

## Issue

The issue for determination is whether there is substantial evidence in the record to support the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999). Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[1] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the

---

[1] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

record as a whole.  Id. (citing Ortiz v. Sec'y of Health & Human
Servs., 955 F.2d 765, 769 (1st Cir. 1999)("We must uphold the
[Commissioner's] findings ... if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate to
support his conclusion.")(second alteration in original)).  The
Court does not reinterpret the evidence or otherwise substitute its
own judgment for that of the Commissioner.  Id. at 30-31 (citing
Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir.
1989)).  "Indeed, the resolution of conflicts in the evidence is
for the Commissioner, not the courts."  Id. at 31 (citing Rodriquez
v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct.
1420, 1426 (1971))).

**Law**

To qualify for DIB, a claimant must meet certain insured
status requirements,[2] be younger than 65 years of age, file an
application for benefits, and be under a disability as defined by
the Act.  See 42 U.S.C. § 423(a).  An individual is eligible to
receive SSI if he is aged, blind, or disabled and meets certain
income requirements.  See 42 U.S.C. § 1382(a).

---

[2] The Court notes that there is a discrepancy in the record regarding
Plaintiff's date last insured.  The ALJ stated that Plaintiff met the
insured status requirements of the Act through March 31, 2011, (Record
("R.") at 15), but the record states elsewhere that Plaintiff is insured
through March 2012, (R. at 145).  However, the Court need not address
this issue as it is not relevant to the appeal, since Plaintiff is
requesting a closed period of disability through April 26, 2009.  (R. at
13)

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...."  42 U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3]  20 C.F.R. §§ 404.1521(a), 416.921(a) (2010).[4]  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See

---

[3] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b) (2010).  Examples of these include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.

[4] The Social Security Administration ("SSA") has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, the Court hereafter will cite only to one set of regulations.  See id.

Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529 (a) (2010).

The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform his past relevant work; and (5) whether he remains capable of performing any work within the economy. See 20 C.F.R. § 404.1520(b)-(g). The evaluation may be terminated at any step. See Seavey, 276 F.3d at 5. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

## ALJ's Decision

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not

engaged in substantial gainful activity during the closed period of April 21, 2007, through April 26, 2009, (R. at 15); that Plaintiff's seizure disorder status post craniotomy and depressive disorder were severe but did not meet or equal any listed impairment, (R. at 15-16); that, mentally, Plaintiff had a mild restriction in his activities of daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence or pace and had experienced no episodes of decompensation, (R. at 16-17); that, physically, Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations: he could not climb ropes, ladders or scaffolds, he could not work at unprotected heights or around dangerous equipment, and, mentally, he could do work with moderately limited concentration, persistence, and pace such that he could understand, remember, and carry out simple 1-2-3 step tasks not involving independent decision making, (R. at 17); that Plaintiff was unable to perform any past relevant work, (R. at 22); that, considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy which Plaintiff could perform, (R. at 23); and that, therefore, Plaintiff was not disabled within the meaning of the Act during the period April 21, 2007, through April 26, 2009, (R. at 24).

**Errors Claimed**

Plaintiff alleges that the ALJ erred in her evaluation of the assessment of consulting psychologist Steven Hirsch, Ph.D., and that as a result both the ALJ's mental RFC and credibility findings are not supported by substantial evidence.

**Discussion**

**I.  The ALJ did not err in her evaluation of the assessment of Dr. Hirsch, the consulting psychologist.**

Plaintiff asserts that the ALJ erred in her evaluation of the IQ test administered by Dr. Hirsch, to which she gave "limited weight," (R. at 22), because she based her decision in large part on her assumption that Plaintiff was able to complete a contest-winning writing sample following the onset of his alleged disability, Plaintiff's Memorandum in Support of his Motion for an Order Reversing the Decision of the Commissioner ("Plaintiff's Mem.") at 8-9.  Plaintiff claims that there is no indication in the record that he completed the writing sample during this period and that therefore the ALJ's evaluation of the assessment of Dr. Hirsch is not supported by substantial evidence.  Id. at 9-10.

On February 20, 2008, Plaintiff was referred to Dr. Hirsch for a psychological evaluation in an attempt to assist in determining Plaintiff's eligibility for disability benefits.  (R. at 273)  On examination, the doctor observed that Plaintiff was alert, cooperative, and oriented in three spheres (person, place, and

8

time); that his speech was clear and his expressive vocabulary skills were rather limited for an English major; that he had a short attention span but his memory for past and recent personal events was functional; that his reality testing was grossly intact; and that his thinking was extremely concrete. (R. at 274) The doctor tested Plaintiff's IQ via the Weschsler Adult Intelligence Scale - Third Edition ("WAIS-III"), finding Plaintiff to have a Verbal IQ of 64, a Performance IQ of 49, and a Full-Scale IQ of 53. (R. at 275) The doctor opined that the WAIS-III "yielded a reliable and valid cognitive profile," (id.), and that Plaintiff's "efforts to tasks were good; however, his performances were frequently quite poor," (id.). The doctor stated that he felt Plaintiff's cognitive functioning was "negatively impacted by the residual effects of the cerebral tumor and the neurosurgery to remove the tumor back in October 2007." (R. at 274) The doctor further noted that Plaintiff was not experiencing any symptomatology associated with clinical anxiety or depression. (R. at 276)

According to the Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR"), an IQ level ranging from 35-40 to 50-55, where Plaintiff's Performance IQ fell, is classified as being consistent with moderate retardation, while an IQ level ranging from 50-55 to approximately 70, encompassing Plaintiff's Verbal IQ, is evidence of mild mental retardation.

DSM-IV-TR at 42.  Plaintiff's Full-Scale IQ of 53 was within both ranges.  Id.  One suffering from moderate mental retardation would be unlikely to progress beyond the second-grade level in academic subjects, might learn to travel independently to familiar places, and could perform unskilled or semiskilled work under supervision in sheltered workshops or in the general workforce.  Id. at 43. One suffering from mild mental retardation could achieve skills up to approximately the sixth-grade level, would maybe need supervision, guidance, and assistance, especially when under unusual social or economic stress, and could usually live successfully in the community, either independently or in supervised settings.  Id.  While Plaintiff does not contend that he meets the disability listing for mental retardation, (R. at 28-29),[5] he implicitly argues that the ALJ should have taken the

_____

[5] In order to meet the listing for mental retardation, a claimant must show "deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  Although Plaintiff's IQ score would meet the required level of severity, Plaintiff does not contend that he meets the listing as his alleged impairment did not begin before age 22.  (R. at 28)  As such, the Court notes that the Commissioner was not required to use the lowest score in evaluating Plaintiff's potential disability, as he is only required to do so in evaluating whether the claimant's impairment meets Listing § 12.05.   See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D(6)(c)("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.").

deficiencies associated with his IQ scores into account when deciding if he was disabled, <u>see</u> Plaintiff's Mem. at 8.

The Commissioner may reject IQ scores that are inconsistent with the record. <u>Clark v. Apfel</u>, 141 F.3d 1253, 1255 (8th Cir. 1998); <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986) (holding that it was "proper for the ALJ to examine the other evidence in the record in determining whether [claimant] was in fact mentally retarded."); <u>id.</u> ("The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation.")(quoting <u>Strunk v. Heckler</u>, 732 F.2d 1357, 1360 (7th Cir. 1984)); <u>id.</u> ("[T]est results must be examined to assure consistency with daily activities and behavior."). The Commissioner is also "not obliged to accept the results of claimant's IQ tests if there is a substantial basis for believing that claimant was feigning the results." <u>Soto v. Sec'y of Health & Human Servs.</u>, 795 F.2d 219, 222 (1st Cir. 1986).

In assessing the IQ scores from Dr. Hirsch, the ALJ afforded them "limited weight," (R. at 22), stating:

> [Plaintiff] performed a wide range of activities including entering and winning a contest on Craig's List and going to Las Vegas to meet with producers about working as a screenwriter. Thus, the testing by Dr. Hirsch is given limited weight as the claimant was able to successfully complete the writing requirements sufficient to impress the producers and the scores are inconsistent with the claimant's activities.

(Id.)  Plaintiff argues that the ALJ's reasoning was erroneous because she relied on an assumption not supported by the record: that Plaintiff composed the writing sample used in winning the contest within the closed period of disability.  See Plaintiff's Mem. at 9.

There is no evidence in the record which supports the ALJ's apparent assumption that Plaintiff composed the writing sample during the closed period of disability,[6] nor is there direct evidence that he wrote the sample earlier.  The contest is referenced twice in the record, both times in Plaintiff's testimony.  In response to the ALJ's question about going to film a show in Las Vegas, Plaintiff responded, "Oh, I've done writing in the past," (R. at 36), and further stated "[I] had the ability to actually go out there and meet with some people about some old ideas that I had," (id.).  Later in the testimony, the following exchange occurred:

---

[6] Defendant essentially concedes this point, failing to defend the reasonableness of the conclusion at all in his 21-page memorandum.  See generally Defendant's Memorandum of Law in Support of Motion for an Order Affirming the Decision of the Commissioner ("Defendant's Mem.").  Instead, Defendant argues that regardless of when Plaintiff wrote the sample, ample evidence exists to uphold the ALJ's decision.  See id. at 11 ("The Commissioner would note, though, that regardless of when Plaintiff completed his writing sample, he was able to find the competition online, understand the rules of contest [sic], and timely submit his writing sample to the producer.")(internal citation omitted); id. at 12 ("The Commissioner would also note that other evidence in the record similarly fails to substantiate a finding that during the relevant period Plaintiff was functioning in the moderately mentally retarded range.").

> Q    So, during this time when you weren't working, and
>       I'm going to concentrate after your surgery, were
>       you doing some writing?
>
> A    I had a long time where I couldn't, where reading
>       and writing would give me just headaches ... and my
>       concentration was pretty poor.

(R. at 49)   From this evidence, it is not clear when Plaintiff
composed the writing sample.   In this regard, it is the ALJ's
responsibility to draw permissible inferences from the record.   <u>See</u>
<u>Rodriquez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st
Cir. 1981).

Even assuming that the inference was impermissible, however,
the ALJ gave the IQ test limited weight not only because of her
presumed assumption that Plaintiff completed his writing sample
during the time of disability, but also because the scores were
"inconsistent with [Plaintiff's] activities."   (R. at 22)
Specifically regarding the contest, Plaintiff's activities included
using the computer, finding the contest on the Internet, submitting
a relevant writing sample, and later flying out to Las Vegas,
staying for six days, and meeting with television producers about
helping them with script writing.   (R. at 36, 48-49)   Plaintiff
further acknowledged that he worked as a personal trainer from July
2007 to September 2007, (R. at 29), and testified that he attended
graduate school classes until either the fall of 2007 or the spring
of 2008, (R. at 33).   As for  his daily activities during the time
of disability, Plaintiff testified that he did limited driving,

took care of his dog, got dressed and took care of his personal grooming, prepared simple meals for himself, did household chores with occasional help, went to the gym, shopped in stores and by computer, and communicated with others via email. (R. at 40, 45-48) Reviewing the record as a whole, the Court finds that the ALJ reasonably decided that the IQ scores from Dr. Hirsch were inconsistent with the record, including Plaintiff's activities during the closed period, a decision well within her authority. See Clark, 141 F.3d at 1255.

Plaintiff contends that the ALJ could not reject the IQ scores based on Plaintiff's other activities because, as a layperson, the ALJ had no basis to draw this conclusion. Plaintiff's Mem. at 10. Plaintiff then goes on to state that the ALJ's findings were not supported by an opinion from any medical source. Id.

Regarding Plaintiff's first claim–that the ALJ could not draw this conclusion as a layperson–it is true that in Nieves v. Secretary of Health & Human Services, 775 F.2d 12 (1st Cir. 1985) the First Circuit reversed the Secretary's decision to reject the validity of an IQ score because of the Secretary's belief that if it were accurate, the claimant would not have been able to perform her prior work. See Nieves, 775 F.2d at 14. However, that case was distinguished by a 2008 decision by this Court. See Wilkinson v. Astrue, No. CA 07-090 M, 2008 WL 1925133, at *4 (S.S.A.). In Nieves, the IQ test "was the only medical evidence before the ALJ

14

on [that] point." 775 F.2d at 14. In contrast, as this Court made clear in <u>Wilkinson</u>, an ALJ is allowed to consider inconsistencies in the record in assessing the validity of IQ scores when the "[medical] evidence regarding [claimant's] IQ [is] not uncontroverted." 2008 WL 1925133 at *4. Here, despite Plaintiff's claim to the contrary, there is ample medical evidence that supports the ALJ's decision, which thus renders the IQ scores "not uncontroverted." <u>Id.</u>

On December 11, 2007, approximately two months before the IQ test, Alexander Scagnelli, M.D., a treating psychiatrist, gave Plaintiff a psychiatric examination. (R. at 312-16)  The doctor found that Plaintiff's overall intelligence was in the average range and that there were no abnormalities in his memory, language functions, higher cognitive processes, or thought processes. (R. at 314-15)  Dr. Scagnelli assessed Plaintiff's Global Assessment of Functioning ("GAF") at 60.[7] (R. at 316)

---

[7] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting <u>Diagnostic and Statistical Manual of Mental Disorders</u> (Text Revision 4th ed. 2000) ("<u>DSM-IV-TR</u>") at 32); <u>see also</u> <u>Lopez v. Barnhart</u>, 78 Fed. Appx. 675, 677 (10th Cir. 2003)("The GAF scale is used by clinicians to report an individual's overall level of functioning."). The GAF "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." <u>DSM-IV-TR</u> at 34. A GAF score between 51-60 is indicative of "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." <u>Id.</u>

Eight days later, neurologist Susanne J. Patrick-MacKinnon, M.D., saw Plaintiff on a referral from John A. Duncan III, M.D., for management of Plaintiff's seizure disorder. (R. at 281) She stated that on a mental status exam, although Plaintiff did appear anxious at times, his speech was clear, his comprehension was good, and he recalled three-out-of-three objects in three minutes time. (R. at 283) Dr. Patrick-MacKinnon then noted that she encouraged Plaintiff to go back to work. (R at. 284)

On March 27, 2008, approximately one month after the IQ test, Joseph Litchman, Ph.D., a non-examining, state agency psychologist, reviewed Plaintiff's medical records and found insufficient evidence to render an opinion on Plaintiff's mental impairment. (R. at 319) Regarding the IQ scores from Dr. Hirsch, Dr. Litchman noted that they stood

> in marked contrast to the brief mental status exams in
> the neuro reports, where memory (eg 3/3 recall),
> concentration, and thinking were all assessed as intact.
> There were no problems with anomia or insight in the Blum
> MD eval. Scagnelli MD psychiatric notes (through 3/08)
> focus on 'stable' mood, with good resp to meds and no
> findings associated with a 2 [standard deviation] decline
> in cognition and processing. Similarly, handwriting ...
> is inconsistent with the [Performance IQ] of "49." In
> sum, performance in the recent [consultative exam] is
> deemed more consistent with exaggerated deficits than
> with any [Organic Brain Syndrome] per se: I/E for
> malingering.

(R. at 331)

Another reviewing medical consultant, Clifford Gordon, Ed.D., reviewed Plaintiff's medical records on June 17, 2008. (R. at 367)

Dr. Gordon noted that Plaintiff had a non-severe anxiety-related disorder termed "adjustment disorder," (R. at 367, 372), with only mild functional limitations, (R. at 377). The doctor stated: "[Plaintiff's] [l]imitations are not severe at this time. Understands and remember [sic] data presented to him in his treatment notes. Mild attentional deficits present. He interacts with others. Lives independently completing tasks." (R. at 379) Thus, Plaintiff's second claim–that the ALJ's opinion was not supported by a medical source–is mistaken. In fact, Dr. Gordon found that Plaintiff had even fewer restrictions because of his mental impairment than the ALJ did. While Dr. Gordon noted merely mild difficulties in maintaining concentration, persistence, or pace, (R. at 377), the ALJ found Plaintiff's limitations in this regard to be moderate, (R. at 16), and agreed with Dr. Gordon that Plaintiff had mild restrictions in activities of daily living and in social functioning, (id.). As such, the ALJ's findings are not only supported by a medical source, but actually find Plaintiff more functionally limited than that source.

Furthermore, the ME testified about the IQ scores at Plaintiff's hearing.[8] (R. at 58-59) In response to a question from Plaintiff's counsel, the ME stated that the IQ test was given

_____

[8] The Court realizes, as both parties point out, that the ALJ did not rely on this testimony from the ME. See Plaintiff's Memorandum in Support of his Motion for an Order Reversing the Decision of the Commissioner ("Plaintiff's Mem.") at 11; Defendant's Mem. at 16-17. However, in the interest of providing a summary of the record as a whole, the Court notes the testimony here.

at a time when Plaintiff was depressed and that "depressed people do not perform well ... on tests of cognitive function, because of the concentration, difficulties of memory and so on, ... so the best thing to do is wait until the claimant is out of the depression ...." (R. at 59) The ME went on to say that if Plaintiff were to be retested, he would do much better. (Id.)

Thus, there is sufficient medical evidence in the record to establish that the evidence regarding Plaintiff's IQ was not uncontroverted. As discussed above, the IQ scores stood in conflict with medical evidence from treating sources Drs. Scagnelli and Patrick-MacKinnon and non-treating state agency sources Drs. Litchman and Gordon, making the conflict one for the Commissioner to resolve. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts in the evidence is for the [Commissioner], not the courts."); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987)("Conflicts in the evidence are, assuredly, for the [Commissioner] -- rather than the courts -- to resolve.").

Moreover, the ALJ was within her authority to give greater weight to the reports of the non-examining medical experts: Dr. Litchman, who stated that the IQ test was more in line with exaggerated defects, and Dr. Gordon, who noted that Plaintiff's limitations were not severe. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988)("It is within

the [Commissioner's] domain to give greater weight to the testimony and reports of medical experts who are commissioned by the [Commissioner].").[9]  As the medical evidence regarding the IQ test was not uncontroverted, the ALJ properly assessed the record as a whole and rejected IQ scores that were inconsistent with that record.  See Clark, 141 F.3d at 1255; see also Nieves, 775 F.2d at 14; Wilkinson 2008 WL 1925133 at *5.

Although a clearer statement regarding the medical evidence than that given here would have been preferable, the Court has examined the entire record and the ALJ's decision is supported by substantial evidence.  See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  While the ALJ should have more expressly relied on the medical evidence in addition to Plaintiff's other activities, the Court, looking at the record as a whole, finds that a reasonable mind could have reached the same conclusion as the ALJ: that the IQ test result was due little weight as it was inconsistent with the record.  See Irlanda Ortiz, 955 F.2d at 769 ("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a

_____

[9] The Court is aware that Dr. Hirsch was chosen by the state agency.  (R. at 273)  However, it was still the ALJ's responsibility to resolve conflicts in the evidence.  In addition, an ALJ is not required to accept the findings of a state agency doctor.  See Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2 (S.S.A.)("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

whole, could accept it as adequate to support his conclusion."); Clark, 141 F.3d at 1255. Thus, remand is unnecessary in this case. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Seymour v. Barnhart, No 02-197-B-W, 2003 WL 22466174, at *3 (D. Me. Oct. 31, 2003)("We have often held that [a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably ha[s] no practical effect on the outcome of the case.")(quoting Bryant ex rel. Bryant v. Apfel, 141 F.3d 1249, 1252 (8th Cir. 1998).

Finally, Plaintiff alleges that the ALJ's mental RFC finding, that Plaintiff had a moderate limitation in concentration, persistence, and pace, is not supported by substantial evidence because the ALJ erred in her evaluation of the findings of Dr Hirsch. Plaintiff's Mem. at 8. While this Court finds that the ALJ did not err in her evaluation of the findings of Dr. Hirsch, it also notes that other substantial evidence supports the ALJ's RFC finding. As previously observed, Dr. Scagnelli found Plaintiff's overall intelligence to be in the average range with no abnormalities in his memory, language functions, higher cognitive processes, or thought process and assessed his GAF at 60, a score indicative of moderate symptoms. (R. at 312-16) Dr. Patrick-

MacKinnon noted that Plaintiff's comprehension was good and that he recalled three-out-of-three objects in three minutes time and encouraged Plaintiff to return to work. (R. at 283-84) Dr. Litchman questioned the results of the IQ scores from Dr. Hirsch, (R. at 319, 331), while Dr. Gordon noted that Plaintiff's limitations were not severe, (R. at 379), and that he had mild restrictions in activities of daily living, mild difficulties in maintaining social function, and mild difficulties in maintaining concentration, persistence, or pace, (R. at 377). Furthermore, Plaintiff flew out to Las Vegas and met with producers about script writing, (R. at 36-37, 48-49), worked until September of 2007, (R. at 22), attended graduate school, (R. at 21), and performed a host of activities of daily living, including performing self-care, cooking, doing household chores with help, shopping, using a computer and telephone, lifting weights at the gym, paying bills, taking medication, doing laundry, watching television, reading, socializing with friends, and talking with his family, (R. at 16).

Therefore, the ALJ's mental RFC finding is supported by substantial evidence in the record and should be upheld by this Court. See Brown, 71 F.Supp.2d at 30.

The Court finds that while the ALJ may have made an assumption not clearly supported by the record, ample medical evidence still supports her decision to give the IQ test from Dr. Hirsch little weight. As a result, the ALJ made no error in assessing

Plaintiff's RFC, which is supported by substantial evidence in the record. Thus, I recommend that Plaintiff's first claim of error be rejected.

## II. The ALJ's credibility finding is supported by substantial evidence.

The ALJ found that Plaintiff was "not entirely credible," (R. at 22), stating that while his "medically determinable impairments could reasonably be expected to cause the alleged symptoms ... [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [RFC]," (R. at 21). The ALJ, following the appropriate regulations, examined Plaintiff's subjective complaints in comparison to the medical evidence pertaining to his depression and mental impairments, (R. at 20-21), and concluded that Plaintiff's "alleged limitations in ... attention, concentration, [and] memory ... [were] not substantiated by competent medical evidence to the degree alleged," (R. at 21).

Plaintiff contends that the ALJ, in making her credibility finding, wrongly relied on her belief that Plaintiff completed his writing sample after the onset of his alleged disability and that she incorrectly used Plaintiff's activities at the time of the hearing and not during the alleged period of disability. Plaintiff's Mem. at 11. Plaintiff further claims that the ALJ made a similar error in her assessment of a Function Report filled out

by Plaintiff's brother.  Id.

An ALJ is required to investigate "all avenues presented that relate to subjective complaints ...."  Avery, 797 F.2d at 28.  In addition, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (S.S.A.).  When assessing the credibility of an individual's statements, the ALJ must consider, in addition to the objective medical evidence, the following factors:

1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate and aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; see also Avery, 797 F.2d at 29 (listing factors relevant to symptoms, such as pain, to be

considered); 20 C.F.R. § 404.1529(c)(3) (2010) (same). The ALJ's credibility finding is generally entitled to deference, especially when supported by specific findings. <u>Frustaglia</u>, 829 F.2d at 195 (citing <u>DaRosa v. Sec'y of Health & Human Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1986)); <u>see also</u> <u>Yongo v. INS</u>, 355 F.3d 27, 32 (1st Cir. 2004)("[T]he ALJ, like any fact-finder who hears the witnesses, gets a lot of deference on credibility judgments."); <u>Suarez v. Sec'y of Health & Human Servs.</u>, 740 F.2d 1 (1st Cir. 1984)(stating that ALJ is "empowered to make credibility determinations ...."); <u>accord</u> <u>Harrell v. Bowen</u>, 862 F.2d 471, 482 (5th Cir. 1988)("It must be remembered that [t]he evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.")(internal quotation marks omitted).

With respect to Plaintiff's first claim, the Court has already found that the ALJ did not rely solely on her belief that Plaintiff composed his writing sample after the onset of his disability, but, rather, took all of Plaintiff's activities during the alleged period of disability into account. Regarding the contest, the ALJ found that Plaintiff performed a "wide range of activities inconsistent with [his alleged limitations] including going out alone and traveling to Las Vegas." (R. at 22) Indeed, it appears the ALJ focused on Plaintiff flying out to Las Vegas for six days after winning the contest and meeting with producers about helping

with a TV show.  (Id.)  The ALJ also focused on other activities performed by Plaintiff not related to the contest, as she noted that Plaintiff worked until September of 2007, (R. at 22), attended graduate school until 2008, (R. at 21), and earlier in her decision referenced Plaintiff's activities of daily living, which included living alone, performing self-care, cooking, doing household chores with help, shopping, using a computer and telephone, attending school, lifting weights at the gym, paying bills, taking medication, doing laundry, riding in a car, sitting in his yard, going out alone, watching television, reading, socializing with friends, and talking with his family, (R. at 16).

As to the second claim–that the ALJ improperly evaluated Plaintiff's activities at the time of the hearing and not during the period of claimed disability–the Court finds that the ALJ properly considered both the objective medical evidence in the record and Plaintiff's reports of symptoms and activities during the period of claimed disability and not, as Plaintiff claims, at the time of the hearing.  Plaintiff quotes the ALJ's decision in support of his claim, but misinterprets the language.  In the relevant quotation, the ALJ stated that Plaintiff's "alleged symptoms at the hearing are not consistent with his activities or treatment notes." (R. at 22)  The sentence follows a discussion of the symptoms Plaintiff alleged he suffered during his period of disability.  (R. at 21-22)  Furthermore, the ALJ made it clear at

the hearing that she was questioning the Plaintiff about his alleged period of disability. (R. at 45)("Now, again we're talking about this period of time up until recently ....").[10]  Thus, the Court thinks it is clear that the ALJ was discussing Plaintiff's alleged limitations during the time of disability in her decision and not his limitations at the time of the testimony.

Because the ALJ supported her credibility ruling with specific findings, it is due deference from the Court. See Frustaglia, 829 F.2d at 195. As the ALJ found, the symptoms Plaintiff alleged at the hearing were not consistent with his activities or treatment notes. (R. at 22)  Plaintiff attested at the hearing that during the alleged period of disability he lost concentration, (R. at 33), had blurred vision, (R. at 39, 54), was depressed and cried every day for a time, (R. at 40-41), had nocturnal epilepsy, (R. at 41), lived alone, (R. at 45), had difficulties shaving and grooming himself, (R. at 46), suffered from vertigo, (id.), went to the gym a few times a week for no more than thirty minutes, (R. at 47), had headaches continuously, (R. at 51-52), had nausea on a daily basis, (R. at 53), had weakness in his left side, (id.), had memory loss, (R. at 54), and had an affected attention span, (R. at 55).  These limitations stand in contrast to what Plaintiff told various

---

[10] Furthermore, Plaintiff's counsel at the hearing made it clear that he was asking his client about the period of disability. (R. at 51)("Now, I just want to cover, make sure that the record is clear regarding the constellation of symptoms you're experiencing, most particularly postoperatively between October of '07 and say April of '09.").

medical sources during the disability period.  (R. at 261)("He has
had no difficulty with blurry vision, double vision, nausea,
vomiting or ataxia."); (R. at 263)("The patient states that he is
doing quite well. ... He has had no difficulty with blurry vision,
double vision, nausea, vomiting[,] or ataxia."); (Id.)("His review
of systems reveals that patient is not complaining of any
headaches[.]"); (R. at 265)("His review of systems per the patient
health questionnaire is unremarkable[.]"); (R. at 307)("Not sad. Not
tired."); (R. at 308)(same); (R. at 526)("Sleeping well.").  In
addition, the ALJ found that Plaintiff's statements on his November
2007 Function Report contrasted with his statements to Dr. Duncan
just three days earlier.  (R. at 22)  On that report, Plaintiff
claimed that he could not do house or yard work because of nausea,
(R. at 169), yet Dr. Duncan noted Plaintiff "has had no difficulty
with ... nausea," (R. at 261).  Plaintiff further stated on the
Function Report: "[I can] lift[] maybe 5 lbs. Can't squat, bend,
reach or kneel due to balance. ... [U]sing hands is difficult due
to lack of concentration." (R. at 171)  However, Dr. Duncan stated
that "[h]e moves all extremities with full strength."  (R. at 261)
Moreover, in the November report, Plaintiff frequently complained
of insomnia, short-term memory loss, headaches, loss of
concentration, dizziness, fatigue, and a lack of balance, (R. at
167-70), but no such complaints exist in the report from Dr.
Duncan, who stated that the "patient continues to do well," (R. at

255); see also Dumas v. Schweiker, 712 F.2d 1545, 1553 (2nd Cir. 1983)("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say.").

The ALJ also noted that Plaintiff indicated on the November report that his doctors wanted him to completely rest, yet Dr. Patrick-MacKinnon encouraged Plaintiff to return to work on December 19, 2007. (R. at 22, 284) Furthermore, reviewing the record as a whole, the Court finds that in late October Plaintiff had been painting his apartment, (R. at 477, 481), and had started working out at the gym again in November, lifting about 100 pounds, (R. at 38), activities which can hardly be classified as resting. Dr. Patrick-MacKinnon also remarked that Plaintiff had no problems with concentration, which is in contrast with the report Plaintiff filled out just a month prior. (R. at 283) As such, the ALJ properly considered the inconsistency of Plaintiff's statements with the evidence in the record in evaluating his credibility. See SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

The Court also finds that Plaintiff was questioned at the hearing regarding the required factors. See SSR 96-7p, 1996 WL 374186, at *3; see also Frustaglia, 829 F.2d at 195. Plaintiff testified as to his daily activities, (R. at 45-48); the location, duration, frequency, and intensity of his symptoms, (R. at 51-55);

factors that precipitated and aggravated the symptoms, (R. at 37, 46, 47, 49); the type, dosage, and effectiveness of his medications, (R. at 31-32); treatment other than medication he received, (R. at 35); and measures other than treatment he used to relieve his symptoms, (R. at 51-52).

Finally, Plaintiff alleges that the ALJ made a "similar error in her assessment of [Plaintiff's] brother's statements[.]" Plaintiff's Mem. at 11. The ALJ found that the Function Report by Plaintiff's brother was due little weight because it assessed far more limitations than the claimant reported on his own function report or at his hearing. (R. at 22)

The Court notes that this was not a credibility finding, but was, rather, the ALJ resolving a conflict in the evidence, a responsibility entrusted to her position.[11] See Irlanda Ortiz, 955 F.2d at 769; Evangelista, 826 F.2d at 141. Many conflicts existed between the two function reports. Plaintiff checked off a box that indicated he had "no problem" with personal care, (R. at 167), yet his brother indicated that Plaintiff wore the same clothes, did not bathe regularly, and needed help shaving his head and face, (R. at 188). Plaintiff stated that he could do laundry and clean with his family's help, (R. at 168), while his brother claimed Plaintiff could not do household chores, (R. at 189). Plaintiff stated that

---

[11] The Court addresses the claim here, however, because Plaintiff alleges this error in his discussion of the ALJ's credibility finding. See Plaintiff's Mem. at 11-12.

he went outside for 10 minutes a day, (R. at 169), while his brother claimed that Plaintiff "rarely" went outside, (R. at 190). Plaintiff also wrote that he shopped and paid bills, (R. at 169), while his brother claimed that Plaintiff did not shop and was not able to pay bills, (R. at 190). Finally, Plaintiff's brother checked off every box regarding functions affected by Plaintiff's condition, including standing, walking, sitting, and getting along with others, (R. at 192), boxes that Plaintiff did not check, (R. at 171).

Plaintiff asserts that these inconsistencies are a result of the five-month gap between the completion of the two forms, Plaintiff's Mem. at 11-12, but points to no evidence that his condition worsened in those five months, id.; see also USA v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). A review was before her departure from the state of the evidence does not show that Plaintiff's condition worsened within this period. In December, 2007, Dr. Patrick-MacKinnon recommended that Plaintiff return to work, (R. at 284), while the examination notes from Dr. Scagnelli from December, 2007 through March 11, 2008—ten days before Plaintiff's brother filled out the report—note nothing of significance, (R. at 306-08). As such, the Court, reviewing the record as a whole, finds that a

reasonable mind could reach the same conclusion as the ALJ: that Plaintiff's brother's Function Report was due "little weight," because, taking the entire record into account, it was in conflict with the other evidence.  See Irlanda Ortiz, 955 F.2d at 769; see also Harrell, 862 F.2d at 482 ("Supporting, objective findings are important to the disability determination because the observations of an individual, particularly a lay person, may be colored by sympathy for the affected relative ....")(citing Fitzsimmons v. Matthews, 647 F.2d 862, 864 (8th Cir. 1981)).

The Court finds that the ALJ did not err in her credibility finding.  The ALJ did not rely solely on her apparent assumption that Plaintiff composed his contest-winning writing sample during the time of his disability, but, rather, examined his activities as a whole.  The ALJ also did not rely on Plaintiff's activities at the time of the hearing.  Instead, she focused on the alleged period of disability.  Furthermore, the ALJ did not err in evaluating the Function Report filled out by Plaintiff's brother, as she found it in conflict with the evidence and properly resolved that conflict, taking the entire record into account.  Therefore, I recommend that Plaintiff's second claim of error be rejected.

### Summary

The Court finds that there is ample evidence in the record to support the ALJ's decision to afford the IQ test from Dr. Hirsch limited weight and that the ALJ's RFC finding is supported by

substantial evidence in the record. The Court further finds that the ALJ's credibility finding is supported by substantial evidence in the record and that the ALJ properly evaluated the Function Report filled out by Plaintiff's brother.

## Conclusion

The Court finds that the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence in the record and is legally correct. Accordingly, I recommend that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


*/s/ David L. Martin*
DAVID L. MARTIN
United States Magistrate Judge
August 26, 2011